### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| THOMAS C. DADE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | NO. 3:13-CV-03180-K |
| | § | |
| GRA-GAR, LLC, | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM OPINION AND ORDER

Before the court is Defendant's Motion for Reconsideration and Request for Expedited Relief (Doc. No. 47). The Court has reconsidered Defendant's Motion for Summary Judgment and Brief in Support (Doc. No. 27). The Court's order denying summary judgment entered December 3, 2014 is **vacated in part**, as to the disparate treatment claim only. Upon reconsideration, the Court **grants** summary judgment on the disparate treatment claim.

### I.      Factual and Procedural Background

The factual background provided in the summary judgment record is summarized as follows. The majority of the facts described herein are presented in the summary judgment record as undisputed. Where facts are disputed they are stated in the light most favorable to the Plaintiff, the non-movant. Plaintiff Thomas Dade ("Dade") was employed by Defendant GRA-GAR, LLC ("GRA-GAR") beginning in January 2007. Dade was initially hired as a painter and later became a body technician. When Dade

1

applied for employment with GRA-GAR, he completed a job application, which asked him about his prior criminal history.  Dade checked the box on his application indicating he had been convicted of or plead guilty to a crime within the last seven years.  The following question on the application asked what the crime was, and Dade answered possession of marijuana.

GRA-GAR is a subsidiary of Werner Enterprises, Inc., a truckload motor carrier, which operates fourteen terminals.  The terminal in Dallas, Texas (the "Terminal") contains a large parking lot for storage trailers, office building, body shop building, trailer shop building, tractor shop building, driver's lounge, motel, guardhouse, safety/inspection lanes, a fuel lane, and a wash bay.  GRA-GAR employees use their employee badge to gain access to the Terminal, and electronic reader keeps a record of the employees who access the Terminal.  Visitors to the Terminal are required to show identification, log-in, and provide a specific reason for their visit.  Once an employee or visitor enters the Terminal, he has access to all parts of the Terminal.

Beginning in November 2007, several criminal incidents involving theft occurred at the Terminal.  In November 2007, tractor-trailers were broken into; one included a load of televisions.  Police found cut out portions of the fence that surrounded the Terminal.  In February 2008, an employee's tools and toolbox were stolen.  On April 3, 2008, a truck driver reported seeing an unmarked tractor with two people unloading exhaust stacks into a Chrysler sedan. The people unloading the exhaust stacks were wearing dark blue pants and shirt, which is the same colors GRA-GAR shop personnel

wear.  On April 4, 2008, a propane powered generator was discovered missing from GRA-GAR's body shop office at the Terminal.  From April 22, 2008 to April 28, 2008, a variety of tools were stolen from the Terminal's body shop.  On March 22, 2009, the fence surrounding the perimeter of the Terminal was cut, and five lawnmowers were stolen from a tractor-trailer.  On March 27, 2009, a trailer with 360 lawnmowers was stolen from the Terminal.  The thieves hot-wired a tractor at the Terminal to steal the trailer and crashed through two gates to exit the Terminal.

On May 15, 2009, two trucks were hot-wired and then hooked to two trailers, which were loaded with televisions.  On July 6, 2009, GRA-GAR employees reported that tools were stolen from tool boxes in the Terminal.  On August 24, 2009, a tractor hooked up to a trailer loaded with televisions was stolen from the Terminal.  On September 16, 2009, GRA-GAR discovered that approximately $10,000 in paint had been stolen from the paint shop.  On January 15, 2010, an employee's tools were stolen.

According to GRA-GAR personnel, GRA-GAR suspected that many of the thefts had been committed by its own employees.  GRA-GAR employees had twenty-four hour access to the Terminal, had keys to the tractors and trailers so could have the ability to hot-wire the tractors, and had knowledge concerning the location of high value freight.  Werner and GRA-GAR became worried that the theft would cause them to lose future business from customers.  As a result of the ongoing theft at the Terminal, GRA-GAR took numerous steps to end the theft and to make the Terminal a safer and more secure place.

In April 2008, GRA-GAR rekeyed the locks to the Terminal shop doors and limited the distribution of new keys.  In May 2008, GRA-GAR implemented heightened hiring standards for new GRA-GAR hires, which included a criminal background check. The heightened hiring standards did not apply to current GRA-GAR employees.  In June 2008, GRA-GAR installed seven new security cameras throughout the Terminal.   In January 2009, GRA-GAR installed new security lighting.   In August and September 2009, GRA-GAR installed razor wire and concrete barriers surrounding the perimeter of the Terminal; entry and exit barriers; and spikes.   In October 2009, an additional security camera was installed in the paint shop.

GRA-GAR terminated employees found or suspected to be involved with the thefts at the Terminal.  On July 6, 2009, GRA-GAR terminated an employee who was caught stealing tools from another employee.  On or around August 24, 2009, GRA-GAR terminated an employee suspected of involvement with the television thefts.  On January 15, 2010, GRA-GAR terminated an employee for theft of parts and CB radios from the Terminal.

After GRA-GAR implemented security measures and terminated employees caught stealing or suspected of involvement with theft at the Terminal, a vehicle was vandalized on Terminal property in July 2010.   Video shows a person wearing dark clothing, consistent with the GRA-GAR uniform, burglarizing the vehicle, but the video is not clear enough to identify the suspect.

In March 2010, GRA-GAR decided to implement heightened employment

standards for existing employees.  On June 3, 2010, GRA-GAR held a meeting with its employees and announced a policy that required employees hired prior to May 2008 to submit to a criminal background check.

According to Dade, employees were told they had to pass a criminal background check in order to gain or maintain their job, but if they had not misrepresented their criminal history on their application, then they had nothing to worry about.  According to GRA-GAR, employees with a criminal history would be qualified for continued employment only if, after a case-by-case analysis, the employee's criminal background met GRA-GAR's more restrictive employment standards.  GRA-GAR asserts it relied upon the following factors in determining if an employee was eligible for continued employment included: (1) the seriousness and type of criminal conviction; (2) the number of convictions; (3) the amount of time elapsed since conviction and/or release from incarceration; (4) the age of the individual when the crime was committed; and (5) evidence of rehabilitation.

GRA-GAR formulated written Internal Guidelines for implementing its new heightened employment standards.  The Internal Guidelines stated that the following criminal convictions would "generally be considered disqualifying offenses":

- Any violent felony convictions in the past 15 years

- Any offense involving violence in the workplace in the past 15 years

- Any offense involving unlawful sexual behavior (excluding statutory offenses) in the past 15 years

5

- Any felony theft, fraud, embezzlement or identity theft crimes (including possession of stolen goods) in the past 15 years

- Any felony crime related to the sale, possession, or distribution of illegal drugs or controlled substances in the past 7 years

- Any misdemeanor theft, fraud, embezzlement or identity theft crimes (including possession of stolen goods) in the past 7 years

- If the employee's job duties include operating a motor vehicle or mobile equipment, more than one DUI in the past 5 years

- If the employee's job duties include operating a motor vehicle or mobile equipment, any misdemeanor crime related to the sale, possession, or distribution of illegal drugs or controlled substances in the past 5 years

- Conviction of multiple crimes (of any type) involving multiple incidents indicative of a pattern of criminal behavior

GRA-GAR asserts that the completed criminal background checks identified fourteen employees who were hired prior to May 2008 and had criminal convictions.  In order to make an individualized determination about each of the fourteen identified employees, Chris Polenz ("Polenz"), GRA-GAR's head of human resources, Chris Boyer ("Boyer"), Werner's associate general counsel, Randy Brinkman ("Brinkman"), GRA-GAR's employment manager, and Dalan Urquhart ("Urquhart"), Werner's associate director of employment, met and analyzed the employees' background records.  Polenz asserts the group considered objective and subjective factors when reviewing each

6

employee.  Seven of the identified employees had convictions that were considered disqualifying convictions, and they were terminated.  Of the seven terminated employees, five were African-American, one was Hispanic, and one was White.

Dade was one of the seven employees terminated under GRA-GAR's heightened employment standards.  Polenz believed a felony drug conviction, like Dade's, was not for possession for individual drug use, but instead rose to the level of intent to distribute. GRA-GAR also considered that Dade had spent time in prison for the charge.  GRA-GAR considered it a negative factor when an employee had served time in prison for a felony drug conviction compared to a conviction without incarceration.  GRA-GAR considered the possibility that Dade had established relationships with persons in prison who could have participated in criminal activity at the Terminal.  GRA-GAR also considered that Dade had multiple performance write-ups in his personnel file, including for gross misconduct for getting into a fight at work.  GRA-GAR concluded that Dade's conviction and his time spent in prison, as well as the multiple write-ups in his personnel file, disqualified him from continued employment.

On July 29, 2010, Dade was notified that his criminal record disqualified from employment and that he was terminated.  GRA-GAR's internal termination report reflects Dade was terminated because he did not meet the newly adopted background check policy.  GRA-GAR did not discuss Dade's criminal conviction with him prior to his being terminated, nor did he have the opportunity to show that the new policy should not apply to him.  Dade claims that although GRA-GAR's internal policy states it

will consider other factors, such as the duties of the position and evidence of rehabilitation, other factors were not considered in GRA-GAR's decision to terminate him.  Dade was replaced by Steven Snyder, a Caucasian.

In August 2010, Dade filed a claim with the Equal Employment Opportunity Commission ("EEOC") alleging race discrimination.  The EEOC found that GRA-GAR violated Title VII with respect to the termination of Dade's employment.  The EEOC believed that GRA-GAR's "application of the criteria [did] not allow for a particularized, case-by-case assessment of the subject employee's circumstances" and appeared to have a disproportional and disparate impact on employees in protected categories. (EEOC Determination Letter, September 30, 2011, Charge Number 450-2010-04058, page 2).

After the EEOC's ruling, Dade filed suit against GRA-GAR, claiming that it had discriminated against him based on his race, in violation of Title VII, the Texas Commission on Human Rights Act ("TCHRA") Tex. Lab. Code §21.051, and 42 U.S.C. §1981.  GRA-GAR moved for summary judgment on all of Dade's claims.  The Court denied GRA-GAR's Motion for Summary Judgment, and GRA-GAR moved the Court to reconsider its Motion for Summary Judgment.

## II.   Summary Judgment Standard

Summary judgment is appropriate when the pleadings, affidavits and other summary judgment evidence show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2551 (1986). The moving party

bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 322-25, 106 S.Ct. at 2551-54. Once a movant makes a properly supported motion, the burden shifts to the nonmovant to show that summary judgment should not be granted; the nonmovant may not rest upon allegations in the pleadings, but must support the response to the motion with summary judgment evidence showing the existence of a genuine fact issue for trial. *Id.* at 321-25, 106 S.Ct. at 2551-54; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-57, 106 S.Ct. 2505, 2513-14 (1986). All evidence and reasonable inferences must be viewed in the light most favorable to the nonmovant. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993 (1962).

### III.   GRA-GAR's Motion for Reconsideration and Request for Expedited Relief

GRA-GAR requests the Court reconsider its denial of summary judgment on Dade's disparate treatment claim. GRA-GAR contends that there is no genuine issue of material fact whether it terminated Dade on account of his race, and therefore, his disparate treatment claim must be dismissed. For the reasons stated below, the Court agrees.

### A.   Applicable Legal Standards for Race Discrimination Claims

Dade relies upon Title VII, 42 U.S.C. §1981, and the TCHRA to provide a statutory basis for his disparate treatment claims. "Claims of racial discrimination brought under §1981 are governed by the same evidentiary framework applicable to

claims of employment discrimination brought under Title VII." *Harrington v. Harris*, 118 F.3d 359, 367 (5th Cir. 1997) (quoting *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448, n.2 (5th Cir. 1996)).  Further, it is well established that Texas state courts coordinate and conform to federal authority under Title VII in applying the TCHRA's provisions against race discrimination.  *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 633-34 (Tex. 2012) (because one of the goals of the TCHRA is to provide for the execution of the policies of Title VII, analogous federal statutes and cases guide the Court's reading of TCHRA); *Caballero v. Central Power and Light Co.*, 858 S.W. 2d 359, 361 (Tex. 1993) (a stated purpose of the TCHRA is to coordinate and conform with federal employment discrimination laws, including Title VII); *see* Tex. Labor Code §21.001(1).  Therefore, all of Dade's disparate treatment claims may be considered together.

Under Title VII, it is illegal for an employer to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race.  42 U.S.C. §2000e-2(a)(1).  The TCHRA similarly prohibits an employer from discharging or discriminating against an employee due to the employee's race.  Tex. Lab. Code §21.051.  "Disparate treatment refers to deliberate discrimination in the terms and conditions of employment" *Munoz v. Orr*, 200 F.3d 291, 299 (5th Cir. 2000).

To prevail on a disparate treatment claim based on race discrimination, a

plaintiff must make a *prima facie* showing of discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973).  Once a *prima facie* showing has been made, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment action.  *Munoz*, 200 F.3d at 299; *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).  Then, if the employer meets its burden, the plaintiff bears the burden of proving that the reason articulated by the employer was a pretext for discrimination.  *Munoz*, 200 F.3d at 299; *McCoy*, 200 F.3d at 557.  The plaintiff must rebut each non-discriminatory reason articulated by the employer.  *McCoy*, 200 F.3d at 557.  This burden-shifting framework is intended to aid courts and litigants in presenting evidence, but the ultimate burden of persuasion remains with the plaintiff at all times.  *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986, 108 S. Ct. 2777, 2784 (1988).

To establish a *prima facie* case, the plaintiff must demonstrate that he (1) is a member of a protected class; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by a person who is not a member of the protected class or was treated less favorably than other similarly situated employees outside the protected class.  *McCoy*, 200 F.3d at 556; *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005); *Singh v. Shoney's, Inc.*, 64 F.3d 217, 219 (5th Cir. 1995).  The burden of proving a *prima facie* case is "not onerous."  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253,

11

101 S. Ct. 1089, 1094 (1981).  The plaintiff may establish a *prima facie* case of discrimination using circumstantial evidence.  *Wheeler,* 415 F.3d at 405.

If the plaintiff makes a satisfactory showing of a *prima facie* case of discrimination, then a presumption that the employer discriminated against the employee arises.  *Burdine,* 450 U.S. at 254, 101 S. Ct. at 1094; *Turner v. Kansas City S. Ry. Co.,* 675 F.3d 887, 900 (5th Cir. 2012).  The burden shifts to the defendant to rebut that presumption and to show a legitimate, non-discriminatory reason for the employment action at issue.  *Burdine,* 450 U.S. at 254, 101 S. Ct. at 1094; *Turner,* 675 F.3d at 900.  The employer must provide both "clear and reasonably specific reasons" for its actions.  *Okoye v. Univ. of Texas Houston Health Sci. Ctr.*, 245 F.3d 507, 513 (5th Cir. 2001); *see Burdine,* 450 U.S. at 258, 101 S. Ct. at 1096.

If the employer shows a legitimate, non-discriminatory reason for the employment action at issue, the plaintiff must raise a genuine issue of material fact that the employer discriminated against him.  *Okoye,* 245 F.3d at 513.  The plaintiff may do this by proving that an issue of material fact exists through circumstantial evidence—by showing that the employer's stated reason is a pretext for discrimination—or by direct evidence of discrimination.  *Id*.

### B.    Analysis

GRA-GAR asserts that Dade cannot establish a *prima facie* case of race discrimination.  GRA-GAR does not challenge that Dade is a member of a protected class, was qualified for his position, or was terminated.  GRA-GAR only challenges

the fourth requirement to establish a *prima facie* case of race discrimination by asserting that Dade cannot show that he was treated less favorably than someone similarly situated but outside of his protected class.

It is well established that a plaintiff may satisfy the fourth requirement of a *prima facie* case of race discrimination by showing that he was treated less favorably than someone similarly situated but outside of his protected class or replaced by someone outside of his protected class. *McCoy*, 200 F.3d at 556. Dade has set forth evidence that he was replaced by Steven Snyder, who is White. GRA-GAR has not disputed this evidence. Therefore, Dade satisfies all four requirements of a *prima facie* case of race discrimination.

Because Dade presented a *prima facie* case of race discrimination, the burden shifts to GRA-GAR to prove it had a legitimate, non-discriminatory reason for terminating Dade. *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824. GRA-GAR implemented its heightened employment standards after a series of thefts at the Terminal. GRA-GAR took other measures to stop the criminal activity and to increase security at the Terminal, including implementing heightened employment standards for new employees. Because the criminal activity at the Terminal continued after GRA-GAR took these measures, GRA-GAR implemented heightened employment standards for its existing employees. Dade was terminated because he did not meet the heightened employment standards. The Court finds that GRA-GAR has met its burden of producing a legitimate, non-discriminatory reason, that is clear

13

and reasonably specific, to terminate Dade.

Because GRA-GAR met its burden of production, the burden shifts back to Dade to raise a genuine issue of material fact that GRA-GAR discriminated against him based on his race. *Okoye,* 245 F.3d at 513. Dade can do this by showing that GRA-GAR's reason for terminating Dade is pretext for racial discrimination or by direct evidence. Dade asserted that GRA-GAR could not provide a legitimate, non-discriminatory reason for Dade's termination. Dade chose not to address the pretext issue and relied solely on the premise that GRA-GAR would not be able to present a legitimate, non-discriminatory reason for its action.

Because Dade did not carry his burden to show direct evidence or pretext of racial discrimination, Dade failed to raise a genuine issue of material fact necessary to survive summary judgment on the disparate treatment claims. Thus, the disparate treatment claims under Title VII, §1981, and the TCHRA must be dismissed.

IV.     Conclusion

The Court has considered Defendant's Motion for Reconsideration and Request for Expedited Relief.   For the foregoing reasons, the Court's order denying summary judgment entered December 3, 2014 is **vacated in part**, as to the disparate treatment claims only.   Upon reconsideration, the Court **grants** summary judgment on the disparate treatment claims.

**SO ORDERED.**

Signed January 8th, 2015.

_Ed Kinkeade_

ED KINKEADE
UNITED STATES DISTRICT JUDGE

15